**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| SAMHITA GERA, derivatively on behalf of GENERAL MOTORS COMPANY, | |
|     Plaintiff, | C.A. No. |
|     vs. | |
| MARY T. BARRA, PAUL A. JACOBSON, ANEEL BHUSRI, WESLEY G. BUSH, JOANNE C. CREVOISERAT, LINDA R. GOODEN, JOSEPH JIMENEZ, JONATHAN MCNEILL, JUDITH A. MISCIK, PATRICIA F. RUSSO, THOMAS M. SCHOEWE, CAROL M. STEPHENSON, MARK TATUM, JAN E. TIGHE, and DEVIN N. WENIG, | **DEMAND FOR JURY TRIAL** |
|     Defendants, | |
|     and | |
| GENERAL MOTORS COMPANY, | |
|     Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Samhita Gera ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant General Motors Company ("GM" or the "Company"), files this Verified Shareholder Derivative Complaint against Mary T. Barra ("Barra"), Paul A. Jacobson ("Jacobson"), Aneel Bhusri ("Bhusri"), Wesley G. Bush ("Bush"), Joanne C. Crevoiserat ("Crevoiserat"), Linda R. Gooden ("Gooden"), Joseph Jimenez ("Jimenez"), Jonathan McNeill ("McNeill"), Judith A. Miscik ("Miscik"), Patricia F. Russo ("Russo"), Thomas M. Schoewe ("Schoewe"), Carol M. Stephenson ("Stephenson"), Mark Tatum ("Tatum"), Jan E. Tighe

1

("Tighe"), and Devin N. Wenig ("Wenig") (collectively, the "Individual Defendants," and together with GM, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of GM, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, as well as for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GM, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by GM's directors and officers from February 2, 2022 to October 26, 2023, inclusive (the "Relevant Period").

2.      GM is a Delaware-incorporated multinational automotive manufacturing company and the largest U.S. automaker in 2022. The Company's car brands include Buick, Cadillac, Chevrolet, GMC, Baojun, and Wuling.

3.      In 2016, GM acquired Cruise LLC ("Cruise") to begin developing software and hardware to make fully autonomous vehicle ("AV") technology. Over the years, Cruise has

obtained testing and driving permits for its AVs predicated on the Company's promises that its AVs were sufficiently safe to be tested amongst the public.

4.      Airbags are a critical safety feature mandatory in every car sold in the US since 1999. As required by law, airbags are designed to prevent serious injury and death during accidents. To be effective, airbags need to act nearly instantaneously to protect passengers. An airbag inflator is a metal canister that contains a chemical propellant and controls the release of the chemical propellant to deploy the airbags.

5.      Since November 2020, GM has recalled numerous products as a result of defective airbag components in its vehicles. The particular design defects are that the airbags are highly explosive upon impact, resulting in screws and metal components of the airbags dispersing upon inflation of the airbag, thereby injuring or killing the passengers the airbags were intended to protect. As a result of the numerous defects and recalls, GM has been exposed to global lawsuits and extensive multidistrict litigation in the United States. But in the face of recalls, the Company has continued to reassure customers that its vehicles' airbags are safe and that the Company has unveiled extensive efforts to identify and address any defects that may exist in its vehicles' airbag inflators (collectively, the "Airbag Safety Misconduct").

6.      The specific issue with the airbags that GM uses in their vehicles, produced by ARC Automotive ("ARC"), is that the airbag inflators rely on ammonium nitrate as the chemical propellant. Ammonium nitrate is commonly used because it affords a high percentage of gas in its combustion and is relatively inexpensive in comparison to other chemical propellants. The fundamental flaw with ammonium nitrate, however, is that it must be precisely phase stabilized. Phase stabilization refers to the process of suppressing the volume changes that would otherwise occur in the chemical propellant as a result of temperature cycling. As such, an unexpected rise in

pressure would cause phase stabilized ammonium nitrate ("PSAN") to burn much faster than other commonly used chemical propellants. When PSAN burns too quickly, it produces a highly explosive force that propels shrapnel from the inflating airbag, thereby creating the risk of severely injuring and/or killing the passenger it was intended to protect.

7.      ARC airbags contain three metal components: an upper pressure vessel, a lower pressure vessel, and a center support. When assembling an airbag inflator, ARC joins these metal pieces through friction welding, a process carried out pursuant to specific designs of both ARC and automakers, including GM. This process, however, creates asymmetrical and brittle welds, thereby enabling the inflator to cause irregular flashes and making the chemical propellant PSAN highly unstable.

8.      The three metal pieces described in the previous paragraph are projected at passengers when the PSAN burns at an irregular rate. Because these metal pieces are projected at high speeds, they stand to, and have, seriously injured and killed passengers.

9.      On January 17, 2019, ARC recognized in a patent that PSAN is highly volatile and, in their own words, "unacceptable" in the face of faulty ventilation systems in their airbags.[1] Accordingly, GM and the entire Board was on notice as early January 17, 2019 that ARC airbags, which use PSAN, contained a fundamental product defect.

10.     Despite this, throughout the Relevant Period, the Company downplayed safety concerns associated with its airbags and understated the need to record additional accrual warranties. As early as February 2, 2022, the Company stated in its Form 10-K for the year ended December 31, 2021 (the "2021 10-K") that "we recorded a warranty accrual of $1.1 billion for the

---

[1] Non-Ammonium Nitrate Based Generants, U.S. Patent No. 0218155 A1, at [2] (filed Jan. 17, 2019) (publ. July 18, 2019).

expected costs of complying with the recall remedy, and ***we believe the currently accrued amount remains reasonable.***" (Emphasis added.)

11.     Also in the 2021 10-K, the Company continued to tout and overstate the public benefits and safety of its AV technology. In particular, the Company represented that "safety will continue to be the gating metric— supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes." The Company would go on to repeat these same representations in subsequent SEC filings and Company press releases.

12.     On December 15, 2022, the multidistrict consumer class action litigation the Company's subsidiary, General Motors LLC, had been subject to as a result of their use of ARC airbags was transferred to and centralized to the Northern District of Georgia (the "Products Liability MDL"). General Motors LLC has been the operating entity that manufactures, markets, and sells GM brand cards and trucks in each state and territory of the United States. The Products Liability MDL subsequently filed an amended complaint in July 2023 and a corrected amended complaint in August 2023. The Products Liability MDL alleges that GM knew of the safety concerns of ARC airbags and fraudulently concealed the breadth of the issue and initiated insufficient recalls. As such, the Company and therefore the Board had been on notice with regards to the safety concerns surrounding ARC Airbags.

13.     In October 2023, the truth regarding the Company's safety representations of both its AV technology and its airbags began to unravel. On October 2, 2023, *NBC Bay Area* published an article titled "Hit-and-run driver strikes pedestrian, tossing her into path of Cruise car in San Fransico" (the "*NBC* Report"). The article revealed that a driverless Cruise AV caused a pedestrian to suffer major injuries after she was pinned underneath the car.  The *NBC* report furthered that

this was not the first safety concern for Cruise vehicles and that the California DMV had launched a safety probe into Cruise AVs in August 2023.

14.     On this news, GM's stock price fell from $32.47 per share on October 2, 2023 by $1.09 per share, or 3.36%, to close at $31.38 per share on October 3, 2023.

15.     Then, on October 5, 2023, the National Highway and Traffic Safety Administration ("NHTSA") held a public hearing to recommend a recall of more than 50 million airbag inflators that had been linked to deadly explosions. The *Wall Street Journal* published an article entitled "GM Has at Least 20 Million Vehicles With Potentially Dangerous Air-Bag Parts," citing people with intimate knowledge of GM's production and products.

16.     On this news, GM's stock price fell from $31.04 per share at the close of trading on October 4, 2023, by $0.73 per share, or 2.35%, to close at $30.31 per share on October 5, 2023.

17.     On October 24, 2023, the California DMV announced the immediate suspension of Cruise's driverless testing permits, stating that Cruise "ha[d] misrepresented . . . information related to [the] safety of the autonomous technology of its vehicles[.]"

18.     On this news, GM's stock price fell from a closing price of $29.22 on October 23, 2023, by $0.66 per share, or 2.26%, to close at $28.56 per share on October 24, 2023.

19.     Just two days later on October 26, 2023, Cruise announced through a social media post on X (formerly known as Twitter) that it would pause its AV operations across the country "to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust[.]"

20.     On this news, GM's stock price fell from a closing price of $28.55 on October 26, 2023, by $1.33 per share, or 4.66%, to close at $27.22 per share on October 27, 2023.

21.     Throughout the Relevant Period, the Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about GM's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

22.     To make matters worse, the Defendants solicited two proxy statements while the misconduct was ongoing. On April 29, 2022, the Company filed with the SEC a Schedule 14A (the "2022 Proxy Statement") which solicited shareholders to vote, *inter alia*, to (1) elect 12 directors to the Board; (2) approve on an advisory basis executive compensation; (3) ratify Ernst & Young ("EY") as the Company's independent registered accounting firm for 2022; (4) vote on shareholder proposals; and (5) transact any other business that is properly presented at the meeting. As a result, shareholders voted to approve the election of all 12 board-recommended director nominees, including Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe,

Stephenson, Tatum, and Wenig, thereby allowing them to continue breaching their fiduciary duties to the Company.

23.     Then, on April 28, 2023, the Company filed with the SEC its Schedule 14A for 2023 (the "2023 Proxy Statement") which solicited shareholders, *inter alia*, to: (1) elect 13 directors; (2) ratify EY as the Company's registered public accounting firm for 2023; (3) approve an on advisory basis executive compensation; (4) approve an amendment to the Company's 2020 Long-Term Incentive Plan to increase the number of shares authorized to be issued; (5) vote on shareholder proposals; and (6) transact any other business that is properly presented at the meeting. As a result of the false and misleading statements contained in the 2023 Proxy Statement, shareholders approved the election of Defendants Barra, Bhusr, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, shareholders approved the appointment of EY, the amendment to the Company's long-term incentive plan, and on an advisory basis the executive officer compensation. The amendment to the long-term incentive plan increased the number of shares available for issuance by 27 million.

24.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the above-referenced false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing GM to repurchase its own stock at artificially inflated rates. Indeed, between February 2022 and August 2023, approximately 72.8 million shares of GM common stock were repurchased, costing the Company over $2.8 billion. Since the repurchased stock was only worth $27.22 per share, which was the adjusted price at close of trading on October 27, 2023, GM overpaid by over $884 million.

25.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and participated in and/or facilitated the Company's participation in the Airbag Safety Misconduct.

26.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Michigan (the "Securities Class Action"), which has subjected the Company's subsidiary to the Products Liability MDL, and which has further subjected the Company to investigations by the NHSTA, the need to remedy the Airbag Safety Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Airbag Safety Misconduct, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, GM is incorporated in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

32.     Plaintiff is a current shareholder of GM. Plaintiff has continuously owned shares of GM common stock since she first purchased the stock on February 16, 2021.

### Nominal Defendant GM

33.     GM is a Delaware corporation with principal executive offices at 300 Renaissance Center, Detroit, MI 48265. GM common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

**Defendant Barra**

34.     Defendant Barra has served as the Company's CEO since January 15, 2014 and as a Company director since January 4, 2016. Prior to being appointed CEO, Defendant Barra served as GM's Executive Vice President, Global Product Development, Purchasing and Supply Chain from August 2013 to January 2014. As a member of the Board, Defendant Barra also serves as the Chair of the Executive Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Barra beneficially owned 4,168,112 shares of GM common stock. Given that the price per share of the Company's stock at the close of trading on March 31, 2023 was $36.68, Defendant Barra owned approximately $152.8 million worth of GM common stock.

35.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Barra received $28,979,570 in total compensation from the Company. This included $2.1 million in salary, $14.625 million in stock awards, $4.875 million in option awards, $6,258,000 in nonequity incentive plan compensation, and $1,121,560 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Barra received $29,136,780 in total compensation from the Company. This included $2.1 million in salary, $14,582,198 in stock awards, $3,937,507 in option awards, $7,644,000 in nonequity incentive plan compensation, and $873,075 in all other compensation.

36.     The 2023 Proxy Statement stated the following about Defendant Barra:

***Committees:*** Executive (Chair)

***Other Public Company Directorships:*** The Walt Disney Company

***Prior Public Company Directorships:*** General Dynamics Corporation

*Prior Experience:* Ms. Barra is Chair and CEO of General Motors. She has served as Chair of the Board of Directors since January 2016 and has served as CEO since January 2014. Prior to becoming CEO, Ms. Barra served as GM's Executive Vice President, Global Product Development, Purchasing and Supply Chain from 2013 to 2014; Senior Vice President, Global Product Development from 2011 to 2013; Vice President, Global Human Resources from 2009 to 2011; and Vice President, Global Manufacturing Engineering from 2008 to 2009. Ms. Barra began her career with GM in 1980.

*Reasons for Nomination:* Ms. Barra has in-depth knowledge of the Company and the global automotive industry; extensive senior leadership, strategic planning, operational, and business experience; and a strong engineering background with experience in global product development.

*Spotlight on ESG Expertise:* Ms. Barra has developed social expertise – in particular, workplace safety and human capital management – during her career at GM, which has included various senior leadership roles. As Chair and CEO, she has spearheaded many initiatives to align the Company's culture with its transformation efforts and holds herself and the leadership team accountable for the development of GM employees. GM benefits from Ms. Barra's experience in these areas as it seeks to be a safe and inclusive workplace.

**Defendant Jacobson**

37.     Defendant Jacobson has served as the Company's CFO and Executive Vice President since December 2020. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Jacobson beneficially owned 271,070 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Jacobson owned approximately $9.94 million worth of GM common stock.

38.     For the 2022 Fiscal Year, Defendant Jacobson received $10,235,938 in total compensation from the Company. This included $1 million in salary, $5,362,500 in stock awards, $1,787,513 in option awards, $1,862,500 in nonequity incentive plan compensation, and $223,425 in all other compensation. For the 2021 Fiscal Year, Defendant Jacobson received $9,578,648 in total compensation from the Company. This included $1 million in salary, $4,860,724 in stock

awards, $1,312,502 in option awards, $2,250,000 in nonequity incentive plan compensation, and $155,422 in all other compensation.

39.     The Company's website[2] states the following about Defendant Jacobson:

Paul Jacobson joined General Motors as executive vice president and chief financial officer in December 2020.

Prior to joining GM, Jacobson served as CFO of Delta Air Lines, Inc., a company he helped transform into one of Fortune magazine's Top 50 Most Admired Companies for six consecutive years. He was named the airline industry's best CFO eight times by Institutional Investor magazine's poll of Wall Street analysts and investors.

Jacobson graduated from Auburn University with a bachelor's degree in aviation management and later received a Master of Business Administration from Vanderbilt University's Owen Graduate School of Management.

He serves on the board of trustees for the Auburn University Foundation, The Harbert College of Business Advisory Council at Auburn and The Owen Graduate School of Management Board of Visitors at Vanderbilt.

**Defendant Bhusri**

40.     Defendant Bhusri has served as a Company director since 2021. As a member of the Board, Defendant Bhusri serves as a member of the Executive Compensation Committee and the Governance and Corporate Responsibility Committee (the "Governance Committee"). According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Bhusri beneficially owned 47,646 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Bhusri owned approximately $1.74 million worth of Company common stock.

---

[2] *Paul Jacobson*, GENERAL MOTORS,
https://www.gm.com/company/leadership.detail.html/Pages/bios/global/en/corporate-officers/Paul-Jacobson (Last visited Jan. 15, 2024),

41.    For the 2022 Fiscal Year, Defendant Bhusri received $290,998 in total compensation from the Company. This included $152,500 in fees earned or paid in cash, $127,529 in stock awards, and $10,969 in all other compensation. For the 2021 Fiscal Year, Defendant Bhusri received $72,029 in total compensation from the Company. This included $35,990 in fees earned or paid in cash, $35,999 in stock awards, and $40 in all other compensation.

42.    The 2023 Proxy Statement stated the following about Defendant Bhusri:

**Committees:** Compensation, Governance

**Other Public Company Directorships:** Workday, Inc.

**Prior Public Company Directorships:** Okta, Inc., Cloudera, Inc., Pure Storage, Inc., and Intel Corporation

**Prior Experience:** Mr. Bhusri is a Co-Founder and Co-CEO of Workday, Inc. and Chairman of its board. Before co-founding Workday in 2005, he held a number of leadership positions at PeopleSoft, Inc., including serving as Vice Chairman of the board and Senior Vice President responsible for product strategy, business development, and marketing. In addition to his role at Workday, Mr. Bhusri is an advisor at Greylock Partners, a leading venture capital firm.

**Reasons for Nomination:** Mr. Bhusri has extensive expertise in software, technology, and fostering growth companies from the start-up phase into mature, public companies. He also has strong leadership experience gained through his role as the CEO of a large, public technology company.

**Spotlight on ESG Expertise:** Mr. Bhusri has developed social expertise as the Co-Founder and Co-CEO of Workday. In that capacity, he advocates for human capital management solutions that focus, in part, on employee engagement. GM benefits from Mr. Bhusri's experience in this area as it takes steps to be the most inclusive company in the world and seeks to minimize the impacts of the transition to EVs on employees.

**Defendant Bush**

43.    Defendant Bush has served as a Company director since 2019. As a member of the Board, Defendant Bush also serves as the Chair of the Executive Compensation Committee and as a member of the Audit Committee and the Finance Committee. According to the 2023 Proxy

Statement, as of March 31, 2023, Defendant Bush beneficially owned 20,000 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Bush owned approximately $733,600 worth of Company common stock.

44.     For the 2022 Fiscal Year, Defendant Bush received $338,019 in total compensation from the Company. This included $195,000 in fees earned or paid in cash, $127,529 in stock awards, and $15,490 in all other compensation. For the 2021 Fiscal Year, Defendant Bush received $335,217 in total compensation from the Company. This included $152,500 in fees earned or paid in cash, $160,060 in stock awards, and $22,657 in all other compensation.

45.     The 2023 Proxy Statement stated the following about Defendant Bush:

**Committees:** Audit, Compensation (Chair), Finance

**Other Public Company Directorships:** Dow Inc. and Cisco Systems Inc.

**Prior Public Company Directorships:** Norfolk Southern Corporation and Northrop Grumman Corporation

**Prior Experience:** Mr. Bush served as Chairman of Northrop Grumman's board of directors from 2011 to 2019. He also served as the CEO of Northrop Grumman from 2010 to 2018. Prior to that, Mr. Bush served in numerous leadership roles at Northrop Grumman, including President and Chief Operating Officer, CFO, and President of the company's Space Technology sector. He also served in a variety of leadership positions at TRW, Inc., before it was acquired by Northrop Grumman in 2002.

**Reasons for Nomination:** Mr. Bush has valuable experience in leading a manufacturing enterprise known for its advanced engineering and technology. He also has strong financial acumen gained through his finance leadership roles and has knowledge of key governance issues, including risk management.

**Spotlight on ESG Expertise:** Mr. Bush has developed environmental expertise as a member of the board of Conservation International. In that capacity, he leverages his scientific training to advocate for natural climate solutions. GM benefits from Mr. Bush's experience in this area as it seeks to create a world with zero emissions.

**Defendant Crevoiserat**

46.     Defendant Crevoiserat has served as a Company director since August 2022. Defendant Crevoiserat also serves as a member of the Audit Committee, Finance Committee, and Governance Committee.

47.     For the 2022 Fiscal Year, Defendant Crevoiserat received $112,150 in total compensation from the Company. This included $57,950 in fees earned or paid in cash, $51,974 in stock awards, and $2,226 in all other compensation.

48.     The 2023 Proxy Statement stated the following about Defendant Crevoiserat:

***Committees***: Audit, Finance, Governance

***Other Public Company Directorships:*** Tapestry, Inc.

***Prior Public Company Directorships:*** At Home Group Inc.

***Prior Experience:*** Since October 2020, Ms. Crevoiserat has been CEO and a member of the board of Tapestry, Inc. Prior to her appointment as interim CEO in July 2020, she served as the CFO. She also previously served in senior roles at Abercrombie & Fitch Co., Kohl's Inc., Wal-Mart Stores, Inc., and May Department Stores.

***Reasons for Nomination:*** Ms. Crevoiserat has cultivated an extensive background in financial expertise and brand development. Her leadership capabilities demonstrated through her various senior leadership retail positions help the company as it grows its global consumer brands through consumer-centric, digital, and data-driven initiatives.

***Spotlight on ESG Expertise:*** Ms. Crevoiserat developed social and environmental expertise – in particular, human rights, supply chain, and compliance – through her experience in the retail industry as she provides oversight of sustainable material sourcing. GM benefits from Ms. Crevoiserat's experience in this area as it seeks to build a more sustainable supply chain aligned with its vision of zero emissions.

**Defendant Gooden**

49.     Defendant Gooden has served as a Company director since 2015. As a member of the Board, Defendant Gooden also serves as Chair of the Risk and Cybersecurity Committee and as a member of the Audit Committee and Executive Committee. According to the 2023 Proxy

Statement, as of March 31, 2023, Defendant Gooden beneficially owned 1,000 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Gooden owned approximately $36,680 worth of Company common stock.

50.     For the 2022 Fiscal Year, Defendant Gooden received $323,852 in total compensation from the Company. This included $177,500 in fees earned or paid in cash, $127,529 in stock awards, and $18,823 in all other compensation. For the 2021 Fiscal Year, Defendant Gooden received $350,050 in total compensation from the Company. This included $172,500 in fees earned or paid in cash, $160,060 in stock awards, and $17,490 in all other compensation.

51.     The 2023 Proxy Statement stated the following about Defendant Gooden:

**Committees:** Audit, Executive, Risk and Cybersecurity (Chair)

**Other Public Company Directorships:** The Home Depot, Inc. and Bright Health Group, Inc.

**Prior Public Company Directorships:** WGL Holdings, Inc., Washington Gas & Light Company, a subsidiary of WGL Holdings, Inc., and Automatic Data Processing, Inc.

**Prior Experience:** Ms. Gooden served as Executive Vice President, Information Systems and Global Solutions of Lockheed Martin Corporation from 2007 to 2013. She also served as Lockheed Martin's Deputy Executive Vice President, Information and Technology Services from October to December 2006, and as its President, Information Technology from 1997 to December 2006.

**Reasons for Nomination:** Ms. Gooden has strong leadership capabilities demonstrated through her various senior leadership positions at Lockheed Martin. She also has significant expertise in operations and strategic planning, as well as an extensive background in information technology and cybersecurity.

**Spotlight on ESG Expertise:** Ms. Gooden developed social expertise through her leadership in the cybersecurity industry. In that capacity, she leverages her technical training to advocate for stringent privacy and data protection controls. GM benefits from Ms. Gooden's experience in this area as it develops innovative software and autonomous driving solutions.

**Defendant Jimenez**

52.     Defendant Jimenez has served as a Company director since 2015. Defendant Jimenez also serves as Chair of the Finance Committee and as a member of the Executive Committee, Executive Compensation Committee, and Risk and Cybersecurity Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Jimenez beneficially owned 32,330 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Jimenez owned approximately $1.18 million worth of Company common stock.

53.     For the 2022 Fiscal Year, Defendant Jimenez received $347,769 in total compensation from the Company. This included $177,500 in fees earned or paid in cash, $127,529 in stock awards, and $42,740 in all other compensation. For the 2021 Fiscal Year, Defendant Jimenez received $374,508 in total compensation from the Company. This included $172,500 in fees earned or paid in cash, $160,060 in stock awards, and $41,948 in all other compensation.

54.     The 2023 Proxy Statement stated the following about Defendant Jimenez:

***Committees:*** Compensation, Executive, Finance (Chair), Risk and Cybersecurity

***Other Public Company Directorships:*** The Procter & Gamble Co., Century Therapeutics, Inc., and Graphite Bio, Inc.

***Prior Public Company Directorships:*** Colgate-Palmolive Company and AstraZeneca plc

***Prior Experience:*** Since 2019, Mr. Jimenez served as Co-Founder and Managing Partner of Aditum Bio, a biotechnology-focused venture capital firm. Prior to that, he served as CEO of Novartis AG from 2010 until his retirement in 2018. Mr. Jimenez led Novartis' Pharmaceuticals Division from October 2007 to 2010 and its Consumer Health Division in 2007. From 2006 to 2007, he served as Advisor to the Blackstone Group L.P. Mr. Jimenez was also Executive Vice President, President, and CEO of Heinz Europe from 2002 to 2006; and President and CEO of H.J. Heinz Company North America from 1999 to 2002.

**Reasons for Nomination:** Mr. Jimenez has served as the CEO of a global company with significant research and development and capital spending in a highly regulated environment. He also has significant experience in finance, strategic planning, and consumer branding and marketing.

**Spotlight on ESG Expertise:** Mr. Jimenez developed environmental expertise addressing reductions in greenhouse gases, waste, effluents, and consumption of natural resources for various manufacturing facilities during his career as a pharmaceutical executive. GM benefits from his experience in this area as it transitions its manufacturing capabilities for an EV future.

## Defendant McNeill

55.     Defendant McNeill has served as a Company director since September 2022. Defendant McNeill also serves as a member of the Governance Committee.

56.     For the 2022 Fiscal Year, Defendant McNeill received $72,969 in total compensation from the Company. This included $38,125 in fees earned or paid in cash, $34,784 in stock awards, and $60 in all other compensation.

57.     The 2023 Proxy Statement stated the following about Defendant McNeill:

**Committees:** None

**Other Public Company Directorships:** Lululemon Athletica

**Prior Public Company Directorships:** None

**Prior Experience:** Since 2020, Mr. McNeill has served as CEO of DVx Ventures, a company focused on early-stage startups. Prior to founding DVx Ventures, he served as Chief Operating Officer of Lyft, Inc. from 2018 to 2019. From 2015 to 2018, he also served as President, global sales, delivery and service of Tesla, Inc., and led the team growing revenues from $2 billion to over $20 billion annually, across 33 countries.

**Reasons for Nomination:** Mr. McNeill has deep experience as both an entrepreneur and as an executive at scale. He is a demonstrated leader in the EV space with expertise in business models, software architecture, and cyber. Through his experience as a senior leader, he has founded and scaled multiple technology and retail companies. His innovative and entrepreneurial experience provide critical insights for the Company's various growth businesses.

***Spotlight on ESG Expertise:*** Mr. McNeill developed environmental expertise – in particular, on greenhouse gas emissions, air quality, and product design and lifecycle management – through his industry experience while driving adoption of EVs. GM benefits from Mr. McNeill's experience in this area as it seeks to disrupt and become the leader in the EV and AV markets.

## Defendant Miscik

58.     Defendant Miscik has served as a Company director since 2018. Defendant Miscik also serves as a member of the Finance Committee and the Risk and Cybersecurity Committee.

59.     For the 2022 Fiscal Year, Defendant Miscik received $296,848 in total compensation from the Company. This included $152,500 in fees earned or paid in cash, $127,529 in stock awards, and $16,819 in all other compensation. For the 2021 Fiscal Year, Defendant Miscik received $341,300 in total compensation from the Company. This included $152,500 in fees earned or paid in cash, $160,060 in stock awards, and $28,740 in all other compensation.

60.     The 2023 Proxy Statement stated the following about Defendant Miscik:

***Committees:*** Finance, Risk and Cybersecurity

***Other Public Company Directorships:*** Morgan Stanley and HP, Inc.

***Prior Public Company Directorships:*** EMC Corporation and Pivotal Software, Inc.

***Prior Experience:*** Ms. Miscik is the CEO of Global Strategic Insights and a Senior Advisor at Lazard Geopolitical Advisory. Previous to her current roles, she served as CEO and Vice Chairman of Kissinger Associates, Inc. from 2017 to 2022 and before that in other senior leadership positions. Prior to joining Kissinger Associates, Ms. Miscik was the Global Head of Sovereign Risk at Lehman Brothers from 2005 to 2008; and from 2002 to 2005, she served as Deputy Director for Intelligence at the U.S. Central Intelligence Agency, where she worked from 1983 to 2005.

***Reasons for Nomination:*** Ms. Miscik has a unique and extensive background in intelligence, security, government affairs, and risk analysis, bringing valuable experience in assessing and mitigating geopolitical and macroeconomic risks in both the public and the private sectors.

*Spotlight on ESG Expertise:* Ms. Miscik has developed governance expertise – in particular, risk management – through years serving as a senior leader in the intelligence community, in various senior roles in the private sector, and through her role as Vice Chairman of the Council on Foreign Relations. GM benefits from Ms. Miscik's experience in this area as it seeks to navigate various geopolitical risks and advocates for climate solutions.

**Defendant Russo**

61.     Defendant Russo has served as a Company director since 2009 and as Independent Lead Director since March 2010. Defendant Russo also serves as the Chair of the Governance Committee and as a member of the Executive, Executive Compensation, and Finance Committees. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Russo beneficially owned 25,000 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Russo owned approximately $917,000 worth of Company common stock.

62.     For the 2022 Fiscal Year, Defendant Russo received $428,752 in total compensation from the Company. This included $277,500 in fees earned or paid in cash, $127,529 in stock awards, and $23,723 in all other compensation. For the 2021 Fiscal Year, Defendant Russo received $412,163 in total compensation from the Company. This included $227,300 in fees earned or paid in cash, $160,060 in stock awards, and $24,803 in all other compensation.

63.     The 2023 Proxy Statement stated the following about Defendant Russo:

*Committees:* Compensation, Executive, Finance, Governance (Chair)

*Other Public Company Directorships:* Hewlett Packard Enterprise Company (Chair), KKR Management LLC, and Merck & Co. Inc.

*Prior Public Company Directorships:* Hewlett-Packard Company and Arconic, Inc.

*Prior Experience:* Ms. Russo served as Lead Director of Hewlett-Packard Company's board of directors from 2014 to 2015. She was GM's Independent Lead Director from March 2010 to January 2014, and in 2021, she was re-appointed to


that role. Ms. Russo served as CEO of Alcatel-Lucent S.A. from 2006 to 2008; Chairman and CEO of Lucent Technologies, Inc. from 2003 to 2006; and President and CEO of Lucent Technologies from 2002 to 2006.

***Reasons for Nomination:*** Ms. Russo has extensive senior leadership experience in corporate strategy, finance, sales and marketing, technology, and leadership development, as well as experience managing business-critical technology disruptions.

***Spotlight on ESG Expertise:*** Ms. Russo has developed deep governance expertise – in particular, board governance – during her tenure as chair of Hewlett Packard Enterprise Company and service on the JUST Capital board. In these capacities, among others, she advocates for enhanced ESG standards for directors and the inclusion of ESG metrics to drive strategic decisions. GM benefits from Ms. Russo's experience as it works to continue to provide ESG disclosures that are meaningful to our investors and other stakeholders.

**<u>Defendant Schoewe</u>**

64.     Defendant Schoewe has served as a member of the Board since 2011. Defendant Schoewe also serves as the Chair of the Audit Committee and as a member of the Executive, Finance, and Risk and Cybersecurity Committees. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Schoewe beneficially owned 22,005 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Schoewe owned approximately $807,143 worth of Company common stock.

65.     For the 2022 Fiscal Year, Defendant Schoewe received $360,269 in total compensation from the Company. This included $187,500 in fees earned or paid in cash, $127,529 in stock awards, and $45,240 in all other compensation. For the 2021 Fiscal Year, Defendant Schoewe received $387,592 in total compensation from the Company. This included $182,500 in fees earned or paid in cash, $160,060 in stock awards, and $45,032 in all other compensation.

66.     The 2023 Proxy Statement stated the following about Defendant Schoewe:

***Committees:*** Audit (Chair), Executive, Finance, Risk and Cybersecurity

***Other Public Company Directorships:*** Northrop Grumman Corporation

***Prior Public Company Directorships:*** KKR Management LLC and PulteGroup, Inc.

***Prior Experience:*** Mr. Schoewe served as Executive Vice President and CFO of Wal-Mart Stores, Inc. from 2000 to 2011. Prior to joining Wal-Mart, he held several senior roles at the Black & Decker Corporation, including CFO from 1993 to 1999. Before joining Black & Decker, Mr. Schoewe worked for Beatrice Companies where he was CFO and Controller of one of its subsidiaries, Beatrice Consumer Durables Inc.

***Reasons for Nomination:*** Mr. Schoewe has extensive financial experience acquired through positions held as the CFO of large public companies, as well as expertise in internal controls, risk management, and mergers and acquisitions. He also has significant international experience through his service as an executive of large public companies with substantial international operations and large-scale transformational installations of global enterprise information technologies.

***Spotlight on ESG Expertise:*** Mr. Schoewe developed social expertise – in particular, supply chain management – during his tenure as CFO at Black & Decker and Wal-Mart and currently as a member of the Audit Committee Leadership Network. In his current capacity, he leverages his training to advocate for improved performance of audit committees and more rigorous controls of ESG disclosures. GM benefits from Mr. Schoewe's experience as we continue our efforts to provide comprehensive and meaningful ESG disclosures.

### Defendant Stephenson

67.     Defendant Stephenson served as a member of the Board from 2009 until she retired on May 12, 2023. While serving on the Board, Defendant Stephenson was the Chair of the Compensation Committee and a member of the Executive Committee and the Governance Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Stephenson beneficially owned 800 shares of GM common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $36.68, Defendant Stephenson owned approximately $29,344 worth of Company common stock.

68.     The 2022 Proxy Statement stated the following about Defendant Stephenson:

***Committees:*** Compensation (Chair), Executive, Governance

***Other Public Company Directorships:*** Maple Leaf Foods Inc. and Ritchie Bros. Auctioneers Incorporated

***Prior Public Company Directorship:*** Ballard Power Systems, Inc., Manitoba Telecom Services, and Intact Financial Corporation

***Prior Experience:*** Ms. Stephenson served as Dean of the Ivey Business School at the University of Western Ontario from 2003 until her retirement in 2013. Prior to joining the Ivey Business School, she was President and CEO of Lucent Technologies Canada from 1999 to 2003 and a member of the Advisory Board of General Motors of Canada, Limited, a GM subsidiary, from 2005 to 2009. Ms. Stephenson is an officer of the Order of Canada.

***Reasons for Nomination:*** Ms. Stephenson has expertise in marketing, operations, strategic planning, technology development, financial management, executive compensation, and North American trade issues.

***Spotlight on ESG Expertise:*** Ms. Stephenson developed governance expertise – in particular, executive compensation management – in part during her tenure as Dean of the Ivey Business School at the University of Western Ontario and as Chair of the Government of Canada's Advisory Committee of Senior Level Retention and Compensation, and serving as chair of the executive compensation committees of other publicly traded companies. GM benefits from Ms. Stephenson's experience in this area as it develops compensation plans that help motivate our workforce to execute our strategy for an all-electric future.

## **Defendant Tatum**

69.     Defendant Tatum has served as a member of the Board since 2021. As a member of the Board, Defendant Tatum serves as a member of the Audit Committee and the Governance Committee.

70.     For the 2022 Fiscal Year, Defendant Tatum received $305,019 in total compensation from the Company. This included $152,500 in fees earned or paid in cash, $127,529 in stock awards, and $24,990 in all other compensation.

71.     The 2023 Proxy Statement stated the following about Defendant Tatum:

***Committees:*** Audit, Governance

***Other Public Company Directorships:*** None

***Prior Public Company Directorships:*** None

***Prior Experience:*** Mr. Tatum joined the National Basketball Association (NBA) in 1999 and was appointed NBA Deputy Commissioner and Chief Operating Officer in 2014. Prior to that, he served in numerous leadership roles at the NBA, including Executive Vice President of Global Marketing Partnerships, Senior Vice President and Vice President of Business Development, Senior Director and Group Manager of Marketing Properties, and Director of Marketing Partnerships.

***Reasons for Nomination:*** Mr. Tatum has extensive senior leadership experience in marketing and sales strategy, managing media relationships, and global business operations. He also has significant expertise driving customer engagement and operations globally through his leadership roles in the NBA.

***Spotlight on ESG Expertise:*** Mr. Tatum has developed social expertise – in particular, in DE&I issues – as President of the NBA's Social Justice Coalition as well as President of the NBA Foundation. In these roles, he advocates for social and racial justice and is working to drive economic opportunity and empowerment in the Black community. GM benefits from his experience in this area as it evolves its culture and seeks to become the most inclusive company in the world.

## Defendant Tighe

72.     Defendant Tighe has served as a member of the Board since April 2023.

73.     The 2023 Proxy Statement stated the following about Defendant Tighe:

***Committees:*** None

***Other Public Company Directorships:*** The Goldman Sachs Group, Inc., Huntsman Corporation, and IronNet Inc.

***Prior Public Company Directorships:*** The Progressive Corporation (not standing for re-election at Progressive's annual meeting on May 12, 2023)

***Prior Experience:*** Vice Admiral Tighe retired from the U.S. Navy in 2018, having served as the Deputy Chief of Naval Operations for Information Warfare and Director of Naval Intelligence. Her prior Flag Officer assignments include command of the Navy's Fleet Cyber Command, President of the Naval Postgraduate School, and Deputy Director of Operations at U.S. Cyber Command.

***Reasons for Nomination:*** Vice Admiral Tighe cultivated her unique operational experience in complex cybersecurity matters, including operational technologies, information systems technology, technology risk management, and strategic

assessments while serving in global operations roles for the U.S. Navy and the National Security Agency.

***Spotlight on ESG Expertise:*** Vice Admiral Tighe has developed social expertise – in particular, in cybersecurity and data privacy – during her service as Commander of Fleet Cyber Command and Deputy Chief of Naval Operations for Information Warfare, where she managed key cybersecurity policies for both operational and information technology. GM will benefit from her experience in this area as it deploys more advanced EV and AV technologies and deals with enhanced regulatory expectations.

### **Defendant Wenig**

74.     Defendant Wenig has served as a member of the Board since 2018. As a member of the Board, Defendant Wenig serves as a member of the Risk and Cybersecurity Committee.

75.     For the 2022 Fiscal Year, Defendant Wenig received $338,292 in total compensation from the Company. This included $182,500 in fees earned or paid in cash, $127,529 in stock awards, and $28,263 in all other compensation.

76.     The 2023 Proxy Statement stated the following about Defendant Wenig:

***Committees:*** Risk and Cybersecurity

***Other Public Company Directorships:*** None

***Prior Public Company Directorships:*** eBay Inc.

***Prior Experience:*** Mr. Wenig served as President and CEO of eBay Inc. and as a member of its board of directors from July 2015 to August 2019. Prior to that time, he served as President of eBay's Marketplaces business from September 2011 to July 2015. Prior to joining eBay, Mr. Wenig was CEO of Thomson Reuters Corporation's largest division, Thomson Reuters Markets, from 2008 to 2011; Chief Operating Officer of Reuters Group plc from 2006 to 2008; and President of Reuters' business divisions from 2003 to 2006.

***Reasons for Nomination:*** Mr. Wenig has extensive senior leadership experience in software and technology, global operations, and strategic planning. He also has significant expertise leading both high-growth companies from the start-up phase and large, complex organizations.

***Spotlight on ESG Expertise:*** Mr. Wenig has developed social expertise as founder of the Wenig Family Charitable Trust. In that capacity, he helps facilitate

technology and data-led solutions to issues of inequality and access in the United States. GM benefits from his experience in this area as it expands its philanthropic efforts, such as our commitment to climate justice through our Climate Fund, dedicated to helping close equity gaps in the transition to EVs and other sustainable technology.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

77.     By reason of their positions as officers, directors, and/or fiduciaries of GM and because of their ability to control the business and corporate affairs of GM, the Individual Defendants owed GM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GM in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GM and its shareholders so as to benefit all shareholders equally.

78.     Each director and officer of the Company owes to GM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

79.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

80.     To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

81.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of GM, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised GM's Board at all relevant times.

82.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

83.     To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of GM were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, Michigan, and the United States, and pursuant to GM's own Code of Conduct (the "Code of Conduct");

      (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)    remain informed as to how GM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of GM and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GM's operations would comply with all applicable laws and GM's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

84.    Each of the Individual Defendants further owed to GM and the shareholders the duty of loyalty requiring that each favor GM's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

85.    At all times relevant hereto, the Individual Defendants were the agents of each other and of GM and were at all times acting within the course and scope of such agency.

86.    Because of their advisory, executive, managerial, directorial, and controlling positions with GM, each of the Individual Defendants had access to adverse, non-public information about the Company.

87.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GM.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

88.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

89.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

90.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GM was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

91.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

92.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GM and was at all times acting within the course and scope of such agency.

## GM'S CODE OF CONDUCT

93.     The Code of Conduct states the following about its purpose:

GM's Code of Conduct is a statement of our shared values that helps us operate openly, honestly, and ethically. Our Code is the cornerstone of our compliance program and guides us to win in business with integrity. Though it doesn't offer an

answer for every situation, it provides the resources you need to make ethical decisions. Refer to it often in your work, use good judgment, and always seek guidance if you need additional assistance

94.     Furthermore, the Code of Conduct provides, as to who must adhere to the Code:

Our Code applies to everyone in our company, at every level, including employees, supervisors, board members, and as applicable, subsidiaries GM controls. GM maintains a Supplier Code of Conduct that sets forth expectations for Suppliers. We expect our third parties, including suppliers, to act in a way that is consistent with the principles and values of our Code when conducting business with GM. We expect employees working with our third parties to hold them accountable.

As a global company, there may be limited circumstances where local law or other legal requirements differ from the standards set forth in our Code. We comply with applicable local laws and our Code. If you become aware of a conflict between our Code and other legal requirements, please contact Legal Staff.

95.     In a section titled "OUR RESPONSIBILITIES," the Code of Conduct states the

following:

**Review our Code.** Consult our Code often in your work. Use it to help make ethical decisions. If you need more information about a specific policy, review our detailed policies on the Policy and Reference Links page and throughout the Code.

**Act ethically**. Always use good judgment and comply with the law, our Code, and our policies. Honor our commitment to high integrity in everything you do. Listen and respond to the concerns of customers, coworkers, dealers, and suppliers.

**Be Bold.** Share questions, concerns, and ideas. Whenever you have questions or need advice, contact your supervisor or seek guidance from another internal resource. Take action and report suspected violations of the law, our Code, and our policies. Provide feedback on problem areas and suggest ways we can improve.

**Cooperate fully.** Ensure misconduct allegations are reported to the appropriate source and respond promptly to any requests you receive as part of a misconduct investigation or internal audit by providing complete and accurate information. Failure to cooperate or provide honest information may be subject to disciplinary action, up to and including termination.

**Understand the rules.** Laws are complex and can change. Know the rules that apply to your work so you can address issues that arise and recognize when to get advice. If you ever need assistance with a legal issue that may affect your job, contact Legal Staff.

96.     In a section titled "ACCURATE RECORDKEEPING," the Code of Conduct states

the following:

> We protect the integrity of our records. Our company may face serious penalties or
> consequences if we don't keep accurate records of financial transactions and
> company information. If you're responsible for preparing public financial
> disclosures, make sure that the information we report is clear, complete, and timely.
> Watch for and report signs of potential fraud, bribery, or money laundering activity
> Each director, officer or employee, to the extent involved in the Company's
> disclosure process, including without limitation the Senior Financial Officers,
> must:

97.     In a section titled "RECORDS MANAGEMENT," the Code of Conduct states the

following, in relevant part:

> We manage our records properly and retain the records we need to support our tax,
> financial, and legal obligations. Always follow our records retention policies and
> securely dispose of records that are no longer needed. Remember to never dispose
> of any information that may be relevant to an investigation or subject to a litigation
> hold.

### GENERAL MOTORS COMPANY BOARD OF DIRECTORS
### CORPORATE GOVERNANCE GUIDELINES

98.     The Company also maintains Corporate Governance Guidelines adopted per the

recommendation of the Governance Committee. The Corporate Governance Guidelines state the

following as to their purpose:

> The Board of Directors (the "Board") of General Motors Company (the
> "Company"), acting on the recommendation of its Governance and Corporate
> Responsibility Committee ("Governance Committee"), has adopted the following
> Corporate Governance Guidelines to promote the effective functioning of the Board
> and its committees and to set forth a common set of expectations as to how the
> Board should perform its functions. These Guidelines are in addition to, and should
> be interpreted in accordance with, any requirements imposed by federal or
> Delaware law, the New York Stock Exchange (the "NYSE"), and the Certificate of
> Incorporation and Bylaws of the Company, each as amended. The Governance
> Committee periodically reviews these Guidelines in light of evolving
> circumstances and for consideration of best practices and recommends changes to
> the Board, as appropriate.

99.     The Corporate Governance Guidelines state the following as to the "Role of the

Board of Directors":

> The Board is elected by the shareholders to oversee their interest in the long-term sustainable health and the overall success of the business and its financial strength. The Board serves as the ultimate decision making body of the Company, except for those matters reserved to or shared with the shareholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.
>
> The core responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders. Directors must fulfill their responsibilities consistent with their fiduciary duties to the shareholders, in compliance with all applicable laws and regulations. The Board oversees management's activities in connection with proper safeguarding of the assets of the Company, maintenance of appropriate financial and other internal controls, and compliance with applicable laws and regulations and proper governance.

100.     Regarding "Management Oversight," the Corporate Governance Guidelines state

the following:

> The business of GM is conducted by management under the oversight of the Board. The roles of the Board and management are related, but distinct. GM's business strategy is developed and implemented under the leadership and direction of the Chief Executive Officer (the "CEO") by its officers and other employees. The members of the Board act as advisers and counselors to the CEO and senior management.
>
> In performing its general oversight function, the Board reviews and assesses GM's strategic and business planning as well as management's approach to addressing significant risks and challenges facing the Company that relate to strategic, operational, financial, legal and compliance, as well as sustainability.

101.     Regarding "Risk Oversight," the Corporate Governance Guidelines state the

following:

> The Board, through its Risk and Cybersecurity Committee, oversees risk management at the Company. The Board and its committee assess whether management has an appropriate framework to manage risks and whether that framework is operating effectively. As part of this function, the Board reviews and discusses reports regularly submitted and engages with management on risk as part of broad strategic and operational discussions.

102.     Regarding "Board Membership Criteria," the Corporate Governance Guidelines state the following, in relevant part:

> The Governance Committee is responsible for reviewing with the Board, on an annual basis, the appropriate skills and characteristics required of Board members considering current Board composition, Company strategy and all relevant facts and circumstances at the relevant time. The selection of qualified directors is complex and crucial to GM's long-term success. The Governance Committee and the Board establish different priorities for recruiting new Board members from time to time depending on the Company's needs and the current make-up of the Board. The Board is committed to actively seeking highly qualified women and individuals from minority groups to include in the pool from which Board nominees are selected and includes diverse, qualified candidates in each pool of candidates from which Board nominees are chosen. In every case, however, candidates for election to the Board must be able to make a significant contribution to the Board's discussion and decision making concerning the broad array of complex issues facing the Company. In assessing potential Board candidates, the Governance Committee seeks to consider individuals with a broad range of business experience and backgrounds.

103.     Regarding "Ethics and Conflicts of Interest," the Corporate Governance Guidelines state the following:

> The Board is committed to upholding the highest legal and ethical conduct in fulfilling its responsibilities. The Board expects all directors, as well as officers and employees, to act ethically at all times and to adhere to the policies set forth in "Winning With Integrity: Our Values and Guidelines for Employee Conduct" (available on the Internet at www.gm.com/investor, under "Corporate Governance). The Board will not permit any waiver of any ethics policy for any director or executive officer. If an actual or potential conflict of interest arises for a director, the director will promptly inform the Chair of the Board, Lead Director or Chair of the Governance Committee. If a significant conflict exists and cannot be resolved, the director should resign. All directors must recuse themselves from any discussion or decision affecting their business or personal interests.

104.     In violation of the Code of Conduct and the Corporate Governance Guidelines, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Safety Misconduct, to issue materially false and misleading statements to the public, and to

facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary

duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and

violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting

thereof.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with

laws and regulations, conduct business in an honest and ethical manner, avoid conflicts of interest,

and properly report violations of the Code of Conduct and Corporate Governance Guidelines.

## **AUDIT COMMITTEE CHARTER**

105.    The Company also maintains an Audit Committee Charter. Under a section titled

"Purpose," the Audit Committee Charter states the following, in relevant part:

> The purpose of the Audit Committee of the Board of Directors of General Motors
> Company is to assist the Board in its oversight of the quality and integrity of GM's
> financial statements, GM's compliance with legal and regulatory requirements, the
> qualifications, performance and independence of the external auditors and the
> performance of GM's internal audit staff.

106.    The Audit Committee Charter also charges the Audit Committee with the following

responsibilities:

> • independently and objectively monitor the effectiveness of GM's financial
>   reporting process and systems of disclosure controls and internal controls;
> • select and engage GM's external auditors and review and evaluate the external
>   auditors' audit process;
> • review and evaluate the scope and performance of the internal audit function;
> • provide for open, ongoing communications regarding GM's financial position and
>   affairs between the Board and the external auditors, GM's financial and senior
>   management, and GM's internal audit staff;
> • review GM's policies and compliance procedures regarding ethics and legal risk;
>   • oversee the preparation of the Audit Committee Report for the annual proxy
>   statement; and
> • provide periodic status reports to the Board.

107.    Under a section titled "Financial Statements," the Audit Committee Charter states

the following responsibilities:

> • Discuss with management and the external auditors the annual audited financial
>   statements and quarterly financial statements prior to filing. This will include a

discussion of Management's Discussion and Analysis of Financial Condition and Results of Operations and GM's earnings announcements, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies, and the results of the external auditors' reviews. These discussions may be general, covering the type of information to be disclosed and presentation to be made, and need not take place in advance. The Committee may be represented by the Committee Chair or a subcommittee to review earnings announcements.

- Periodically and in connection with the review of annual audited financial statements and quarterly financial statements:
  - o Review critical accounting policies, financial reporting and accounting standards and principles (including significant changes to these principles or application), and key accounting decisions and judgments affecting GM's financial statements. The review shall include the rationale for such choices and other GAAP treatments considered by management, if appropriate;
  - o Review the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;
  - o Review with the external auditors any alternative accounting treatment or fraud or illegal acts that the external auditors discussed with management, disagreements with management, difficulties encountered in performing its review or audit, or any issues with management's response to any of the foregoing;
  - o Review GM's financial reporting process, including disclosure controls and procedures, the systems of internal control, and the external auditors' attestation of management's internal control report;
  - o Discuss with the external auditors matters required to be discussed by the Public Company Accounting Oversight Board Statement on Auditing Standards No. 1301 regarding the conduct of the audit; and
  - o Review any disclosure of material weaknesses or significant deficiencies in the design or operation of internal controls and any additional audit procedures performed as a result of such weaknesses or deficiencies.

108.    Under a section titled "Non-Financial Report: Sustainability, Environmental, Social, and Governance ("ESG"), and Integrated Reporting," the Audit Committee Charter states the following:

- At least annually, review legislative and regulatory developments, including changes affecting ESG and climate risk disclosures within the financial reporting framework.
- Monitor developments in integrated reporting for these areas for alignment with financial reporting, including discussions with management and the external auditor regarding the Company's reporting and disclosure with respect to ESG matters made pursuant to sustainability reporting frameworks (e.g., the Value

Reporting Foundation, Task Force on Climate-Related Financial Disclosures, Global Reporting Initiative, etc.) and any assurance being provided by the external auditor with respect to such reporting and disclosure.

- At least annually, review reports by management regarding internal quality control procedures over ESG disclosures.
- Annually review for approval, in consultation with the Governance and Corporate Responsibility Committee, the Sustainability Report.

109.    Under a section titled "Legal, Compliance, and Risk Management," the Audit

Committee Charter states the following:

- Oversee the establishment and maintenance of procedures for the receipt, retention, and treatment of complaints or concerns received by GM regarding accounting, internal accounting controls, or auditing matters, including enabling employees to submit concerns confidentially and anonymously.
- Review management's disclosure of any fraud that involves management or other employees who have a significant role in internal control.
- At least annually, review procedures and compliance processes regarding corporate ethics and standards of business conduct as embodied in GM's code of conduct, Winning With Integrity, and approve any significant revisions.
- Provide oversight for legal, regulatory and compliance programs. The General Counsel and the Chief Compliance Officer shall report, and have direct access, to the Audit Committee on legal, regulatory and compliance matters.
- Review management's assessment of legal and regulatory risks identified in GM's compliance programs.
- At least annually, and more frequently as necessary, meet in private session with the General Counsel.
- Annually review and approve the Global Ethics and Compliance Center budget, staffing, allocation of resources, and annual plan of activities and when material changes, its Charter.
- At least annually, and more frequently as necessary, meet in private session with the Chief Compliance Officer.
- Receive notification before the Chief Compliance Officer is terminated, or the Chief Compliance Officer's compensation or scope of their duties are significantly diminished.
- As the Qualified Legal Compliance Committee (QLCC), review and discuss any reports received from attorneys regarding securities law violations and/or breaches of fiduciary duties which were reported to the General Counsel or the Chief Executive Officer and not resolved to the satisfaction of the reporting attorney.
- Discuss policies regarding risk assessment and risk management, which should include discussion of GM's major financial and accounting risk exposures and actions taken to mitigate these risks.

110.   In violation of the Audit Committee Charter, Defendants Bush, Crevoiserat, Gooden, Schoewe, and Tatum failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions, including as each related to the Airbag Safety Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

111.   GM is a Delaware-incorporated multinational automobile manufacturer with principal executive offices in Detroit, Michigan. GM describes its business as "design[ing], build[ing] and sell[ing] trucks, crossovers, cars, and automobile parts and provid[ing] software-enabled services and subscriptions worldwide." GM states that its "vision for the future is a world with zero crashes, zero emissions and zero congestion, which guides our growth-focused strategy to invest in electric vehicles (EVs) and autonomous vehicles (AVs)[.]"

### The Airbag Safety Misconduct

112.   GM has been facing administratively mandated product recalls in addition to multidistrict litigation as a result of faulty airbags in their vehicles.

113.   GM had been on notice through ARC patents as early as January 2019 that ARC airbag inflators contained a design defect that causes the chemical propellant PSAN to burn at a higher rate. PSAN is an easily obtainable and less expensive alternative to other chemical propellants, but it is highly sensitive to pressure and temperature changes. As a result of this defect, the chemical propellant explodes, and the metal components of the airbag inflators are projected at the passenger it was designed to protect. These metal components, when launched at high speeds, can seriously injure and/or kill the passenger.

114.    ARC's design of its airbag inflators, however, do not happen in a vacuum. Indeed, the use PSAN and the specific structure of the airbag were made pursuant to design specifications of automobile manufacturers, including GM.

115.    Additionally, GM is the majority investor in Cruise which develops AVs. GM has touted the ability of Cruise to receive driverless testing permits as a result of its successful technology. Recently, however, Cruise vehicles have been the center of a number of pedestrian injuries and, as a result, has had its driverless testing permits indefinitely suspended in California.

116.    Accordingly, the false and misleading statements detailed below center around the Company's Airbag Safety Misconduct in which it knew, or should have known and ignored, the plethora of airbag issues plaguing their vehicles. Additionally, the false and misleading statements detail the Company overstating the safety and advancement of Cruise AV technology and the subsequent suspension of Cruise's driverless testing permits.

**False and Misleading Statements**

*2021 10-K*

117.    The Relevant Period begins on February 2, 2022, when GM filed the 2021 10-K with the SEC, which reported the Company's financial and operational results for the 2021 Fiscal Year. The 2021 10-K included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Barra and Jacobson attesting to the 2021 10-K's accuracy. Additionally, Defendants Barra, Jacobson, Russo, Bhusri, Bush, Gooden, Jimenez, Miscik, Schoewe, Stephenson, Tatum, and Wenig signed the 2021 10-K.

118.    In the 2021 10-K, the Company downplayed: (1) the safety concerns associated with airbags in its vehicles; and (2) any need to record additional warranty accruals for related product recalls. Moreover, the Company represented that it was making strong efforts to analyze

and identify any perceived defects in its vehicles' airbag inflators. Specifically, the 2021 10-K

stated:

> In November 2020, the NHTSA directed that we replace the airbag inflators in our GMT900 vehicles, which are full-size pickup trucks and SUVs, and *we decided not to contest NHTSA's decision.* While we have already begun the process of executing the recall, given the number of vehicles in this population, the recall will take several years to be completed. Accordingly, in the year ended December 31, 2020, we recorded a warranty accrual of $1.1 billion for the expected costs of complying with the recall remedy, and *we believe the currently accrued amount remains reasonable.*
>
> GM has recalled certain vehicles sold outside of the U.S. to replace Takata Corporation (Takata) inflators in those vehicles. There are significant differences in vehicle and inflator design between the relevant vehicles sold internationally and those sold in the U.S. *We continue to gather and analyze evidence about these inflators and to share our findings with regulators.* Any additional recalls relating to these inflators *could be material to our results of operations and cash flows.*
>
> There are several putative class actions that have been filed against GM, including in the federal courts in the U.S., in the Provincial Courts in Canada and in Mexico, *arising out of allegations that airbag inflators manufactured by Takata are defective.* At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of possible loss.

(Emphasis added.)

119. Moreover, the 2021 10-K touted Cruise's AV technology and progress with

regulatory approvals and permits, as well as the purported public benefits and safety of GM's

products. Specifically, the 2021 10-K stated:

> Cruise is driving leadership in the development and commercialization of AV technology. We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all-electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda), will be built on General Motors' all-new modular architecture, powered by the Ultium platform, at Factory ZERO starting in early 2023, pending government approvals. In October 2020, Cruise received a driverless test permit from the California Department of Motor Vehicles to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing. In October 2020, GM and Cruise also announced they will file an exemption petition

with the National Highway Traffic Safety Administration (NHTSA) seeking regulatory approval for the Origin's deployment, and withdrew an earlier exemption petition that was limited to the Cruise AV derived from the Chevrolet Bolt platform.

In June 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles. In September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California. ***Given the potential of all-electric self-driving vehicles to help save lives***, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations ***safety will continue to be the gating metric — supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes.***

(Emphasis added.)

120.     The 2021 10-K was materially false and misleading because the Company failed to disclose that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***March 18, 2022 Press Release***

121. On March 18, 2022, the Company issued a press release announcing it was making additional investments into the Cruise segment. In the press release, the Company also emphasized the advanced capabilities and safety of Cruise's AV technology. In particular, the Company emphasized that Cruise "is a leader on the pathway to commercial autonomous ridesharing and delivery, creating significant value for both GM shareholders and Cruise's minority shareholders."

122. Regarding the safety of Cruise's AV technology, the press release stated the following:

> Last month Cruise achieved a significant milestone toward its vision of a safer, more sustainable and accessible transportation future as it became the first company to offer fully driverless rides to the public in a major U.S. city.
>
> The Cruise Origin is a zero-emissions, shared, electric vehicle that has been purposefully designed from the ground up to operate without a human driver. ***This means it does not rely on certain human-centered features, like a steering wheel or a sun visor, to operate safely.*** In the spirit of the U.S. Department of Transportation's six guiding principles for work on innovation in transportation, the Origin seeks to be in service of something greater: driving environmental sustainability, ensuring U.S. leadership in developing and manufacturing autonomous technology and artificial intelligence, supporting the American workforce and promoting accessibility.

(Emphasis added.)

### *1Q22 10-Q*

123. On April 27, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2022 (the "1Q22 10-Q"). Attached to the 1Q22 10-Q were SOX Certifications signed by Defendants Barra and Jacobson attesting to its accuracy.

124. The 1Q22 10-Q contained substantively the same statements as those referenced in ¶ 118, again downplaying the substantial safety concerns associated with airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while overstating the Company's attempts to analyze and identify defects within its vehicles' airbag inflators.

125.    Additionally, the 1Q22 10-Q again touted the safety and development of Cruise's AV technology, stating:

> Gated by safety and regulation, Cruise continues to make significant progress towards commercialization of a network of on-demand AVs in the United States and globally. In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California [DMV] to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California.

***2022 Proxy Statement***

126.    On April 29, 2022, the Company filed its 2022 Proxy Statement with the SEC. Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig solicited the 2022 Proxy Statement which, *inter alia*, called for shareholders to reelect all of them to the Board. The misrepresentations and omissions set forth herein were material to shareholders in approving the reelection of these directors to the Board, who would not have been approved had shareholders been informed of the true financial state of the Company, the Airbag Safety Misconduct, and the wrongdoing alleged herein.

127.    With respect to "Risk Oversight," the 2022 Proxy Statement stated:

> The Board has overall responsibility for risk oversight and focuses on the most significant risks facing the Company. The Board discharges its risk oversight responsibilities, in part, through delegation to its Committees. The Company's risk governance is facilitated through a top-down and bottom-up communication structure, with the tone established at the top by Ms. Barra, our Board Chair and CEO, who is also our Chief Risk Officer, and other members of management, specifically the Senior Leadership Team. The Senior Leadership Team also utilizes our Risk Advisory Council, an executive-level body with delegates from each business unit, to discuss and monitor the most significant enterprise and emerging risks in a cross-functional setting. They are tasked with championing risk management practices and integrating them into their functional or regional business units.

128.    With respect to the Audit Committee, the 2022 Proxy Statement represented that the Audit Committee "fulfilled all of its core charter obligations" and "reviewed and discussed the consolidated financial statements with management and EY[.]"

129.    Regarding the Code of Conduct, the 2022 Proxy Statement stated the following, in relevant part:

> The Board is committed to the highest legal and ethical standards in fulfilling its responsibilities. We have adopted a code of business conduct and ethics, "Winning with Integrity," that applies to everyone in our Company, at every level, including employees, executives, Board members and, as applicable, subsidiaries that GM controls. This Code of Conduct forms the foundation for compliance with corporate policies and procedures and creates a Company-wide focus on uncompromising integrity in every aspect of our operations. It embodies our expectations on a number of topics, including workplace and vehicle safety; DE&I; conflicts of interest; protection of confidential information; insider trading; competition and fair dealing; human rights; community involvement and corporate citizenship; political activities and lobbying; preservation and use of Company assets; and compliance with laws and regulations. Employees are expected to report any conduct that they believe in good faith to be an actual or apparent violation of our Code of Conduct. The Code of Conduct is available at *investor.gm.com/resources*.

130.    In total, the 2022 Proxy Statement solicited shareholders to approve: (1) the reelection of Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig to the Board; (2) approve on an advisory basis executive officer compensation; (3) ratify selection of EY as the registered public accounting firm; (4) reject shareholder proposals; and (5) transact any other business that is properly presented at the meeting.

131.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Airbag Safety Misconduct; (2) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because,

despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

132.    The 2022 Proxy Statement also failed to disclose material adverse facts about the Company's business, operations, and prospects, Specifically, the identified statements failed to disclose that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2Q 2022 Form 10-Q*

133.    On July 26, 2022, the Company filed a quarterly report on Form 10-Q with the SEC in which it reported the Company's financial and operational results for the quarter ended June 30, 2022 (the "2Q22 10-Q"). Attached to the 2Q22 10-Q were SOX Certifications signed by Defendants Jacobson and Barra attesting to its accuracy.

134.    The 2Q22 10-Q contained substantively the same statements as those referenced in ¶¶ 118 and 124, again downplaying the substantial safety concerns associated with airbags in GM's

vehicles and the need for additional warranty accruals for related product recalls, while overstating the Company's attempts to analyze and identify defects within its vehicles' airbag inflators.

135.    Additionally, the 2Q22 10-Q contained substantively identical statements as referenced in ¶¶ 119 and 125 regarding the safety and development of Cruise's AV technology. In addition, the 2Q22 10-Q touted the driverless test permits Cruise had received, stating:

> In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco. Refer to the "Liquidity and Capital Resources" section of this MD&A for information about GM's additional investment in Cruise.

### August 2, 2022 Press Release

136.    On August 2, 2022, the Company issued a press release titled "Cruise LLC Driverless Rides Update." The press release read, in full:

> Cruise LLC has now completed over a quarter of a million driverless miles and thousands of driverless rides in San Francisco as of August 1, 2022. The next steps for Cruise in the second half include working with regulators to increase their hours of operation and service area, expanding their fleet of Bolt AVs and testing the Cruise Origin.

### 3Q 2022 Form 10-Q

137.    On October 25, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2022 (the "3Q22 10-Q"). Attached to the 3Q22 10-Q were SOX Certifications signed by Defendants Jacobson and Barra attesting to its accuracy.

138.    The 3Q22 10-Q contained substantively similar statements to referenced in ¶¶ 118, 124, and 134 which understated the safety concerns with the airbags in GM's vehicles and the need

for additional warranty accruals for related product recalls. Additionally, it overstated the Company's attempts at analyzing and identifying the defects within its vehicles' airbag inflators.

139.    Additionally, the 3Q22 10-Q contained the same statements referenced in ¶¶ 119, 125, 135, and 139 regarding the safety and development of Cruise's AV technology.

### *2022 Form 10-K*

140.    On January 31, 2023, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K"). Attached to the 2022 10-K were SOX certifications signed by Defendants Jacobson and Barra attesting to its accuracy. Additionally, the 2022 10-K was signed by Defendants Barra, Jacobson, Russo, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Schoewe, Stephenson, Tatum, and Wenig.

141.    The 2022 10-K stated the following, and substantively the same statements as referenced above, regarding the safety concerns in the airbags in GM's vehicles:

> In November 2020, NHTSA directed that we replace the Takata Corporation (Takata) airbag inflators in our GMT900 vehicles, which are full-size pickup trucks and SUVs, and we decided not to contest NHTSA's decision. While we have already begun the process of executing the recall, given the number of vehicles in this population, the recall will take several years to be completed. Accordingly, in the year ended December 31, 2020, *we recorded a warranty accrual of $1.1 billion for the expected costs of complying with the recall remedy, and we believe the currently accrued amount remains reasonable.*

> GM has recalled certain vehicles sold outside of the U.S. to replace Takata inflators in those vehicles. *There are significant differences in vehicle and inflator design between the relevant vehicles sold internationally and those sold in the U.S. We continue to gather and analyze evidence about these inflators and to share our findings with regulators.* Any additional recalls relating to these inflators could be material to our results of operations and cash flows.

> There are several putative class actions that have been filed against GM, including in the federal courts in the U.S., in the Provincial Courts in Canada and in Mexico, arising out of allegations that airbag inflators manufactured by Takata are defective.

> At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of reasonably possible material loss.

(Emphasis added.)

142.    Regarding Cruise's AV technology, permit approvals, and purported safety benefits, the 2022 10-K stated the following:

> General Motors and Cruise are pursuing what we believe is the most comprehensive path to autonomous mobility in the industry. In September 2021, Cruise began operating a driverless ride hail service in San Francisco, California, and in June 2022, began charging the public for driverless rides. Cruise continues to make regulatory progress in California. In December 2022, Cruise received regulatory approval to expand its operational design domain in California. Cruise is also seeking regulatory approval to add the Cruise Origin to its driverless test permit. Additionally, in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas. ***Given the potential of all-electric self-driving vehicles to help save lives***, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations, ***safety will continue to be the gating metric, supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes.***
>
> We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all-electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda) will be built on GM's all-new modular architecture, powered by the Ultium platform, at Factory ZERO starting in 2023 pending government approvals. GM and Cruise are awaiting a decision on an exemption petition that was filed with the National Highway Traffic Safety Administration (NHTSA) seeking regulatory approval for the Origin's deployment.

(Emphasis added.)

***1Q23 10-Q***

143.    On April 25, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2023 (the "1Q23 10-Q"). Attached to the 1Q23 10-Q were SOX certifications signed by Defendants Jacobson and Barra attesting to its accuracy.

144.    The 1Q23 10-Q contained substantively the same statements as referenced in ¶¶ 118, 124, 134, and 138 which understated the safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls. Additionally, it overstated the Company's attempts at analyzing and identifying the defects within its vehicles' airbag inflators.

145.    Additionally, the 1Q23 10-Q contained identical statements as referenced in ¶¶ 119, 125, 135, and 139 pertaining to the development and safety of Cruise's AV technology. Moreover, it emphasized the regulatory approval Cruise was obtaining, stating that "in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas. GM and Cruise are also awaiting a decision on an exemption petition that was filed with NHTSA seeking regulatory approval for the deployment of the Cruise Origin."

### *2023 Proxy Statement*

146.    On April 28, 2023, the Company filed its 2023 Proxy Statement with the SEC. Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig solicited the 2023 Proxy Statement which, *inter alia*, called for shareholders to reelect all of them to the Board and approve an amendment to the 2020 Long-Term Incentive Plan. The misrepresentations and omissions set forth herein were material to shareholders in approving the reelection of these directors to the Board and amendments to the Company's incentive plan, who would not have approved such items had shareholders been informed of the true financial state of the Company, the Airbag Safety Misconduct, and the wrongdoing alleged herein.

147.    The Amendment to the Company's 2020 Long-Term Incentive Plan centered on increasing the number of available shares for issuance by 27 million shares. The 2023 Proxy Statement stated that the Amendment was necessary to "support our performance-based compensation programs" which are "a critical component of our executive compensation structure that allows the Company to continue to attract, motivate, and retain the top-tier talent necessary[.]"

148.    In addition to the proposal related to the 2020 Long-Term Incentive Plan, the 2023 Proxy Statement also called for shareholders, *inter alia*: (1) to reelect Defendants Barra, Bhusri, Bush Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig to the Board; (2) to ratify EY as the Company's independent public accounting firm; (3) to approve, on an advisory basis, named executive officer compensation; and (4) to transact any other business that is properly presented at the meeting.

149.    With respect to "Risk Oversight," the 2023 Proxy Statement stated:

The Board has overall responsibility for risk oversight and focuses on the most significant risks facing the Company. The Board discharges its risk oversight responsibilities, in part, through delegation to its committees. The Company's risk governance is facilitated through a top-down and bottom-up communication structure, with the tone established at the top by Ms. Barra, our Board Chair and CEO, and other members of management, specifically the Senior Leadership Team. The Senior Leadership Team also utilizes our Risk Advisory Council, an executive-level body with delegates from each business unit, to discuss and monitor the most significant enterprise and emerging risks in a cross-functional setting. They are tasked with championing risk management practices and integrating them into their functional or regional business units.

150.    With respect to the Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

The Board is committed to the highest legal and ethical standards in fulfilling its responsibilities. We have adopted a code of business conduct and ethics, "Winning with Integrity," that applies to everyone in our Company, at every level, including employees, executives, Board members and, as applicable, subsidiaries that GM controls. This Code of Conduct forms the foundation for compliance with corporate policies and procedures and creates a Company-wide focus on uncompromising

integrity in every aspect of our operations. It embodies our expectations on a number of topics, including workplace and vehicle safety; DE&I; conflicts of interest; protection of confidential information; insider trading; competition and fair dealing; human rights; community involvement and corporate citizenship; political activities and lobbying; preservation and use of Company assets; and compliance with laws and regulations. Employees are expected to report any conduct that they believe in good faith to be an actual or apparent violation of our Code of Conduct. The Code of Conduct is available at *investor.gm.com/esg*.

151.    With respect to the Audit Committee, the 2023 Proxy Statement represented that the Audit Committee "fulfilled all of its core charter obligations" and "reviewed and discussed the consolidated financial statements with management and EY[.]"

152.    The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Airbag Safety Misconduct; (2) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

153.    The 2023 Proxy Statement also failed to disclose material adverse facts about the Company's business, operations, and prospects, Specifically, the identified statements failed to disclose that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing

permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### May 12, 2023 Reuters Article

154.     On May 12, 2023, news emerged that the Company had issued a recall for almost one million of its vehicles due to defective airbags. *Reuters* reported in an article titled "GM recalling nearly 1 million U.S. vehicles for air bag defect," the following, in relevant part:

> [GM] opens new tab said on Friday it will recall nearly 1 million sport utility vehicles in the United States because the driver's air-bag inflator may explode during deployment.
>
> The recall covers 994,763 Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles from the 2014 through 2017 model years with modules produced by ARC Automotive Inc. Dealers will replace the driver's air-bag module.
>
> The National Highway Traffic Safety Administration said a driver in Michigan of a 2017 Chevrolet Traverse was in a crash in which the front-driver airbag inflator ruptured during deployment causing facial injuries.
>
> An April 25 inspection confirmed that the front driver airbag inflator ruptured in the vehicle.

### 2Q23 Form 10-Q

155.     On July 25, 2023, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30,

2023 (the "2Q23 10-Q"). Attached to the 2Q23 10-Q were SOX certifications signed by Defendants Jacobson and Barra attesting to its accuracy.

156.    The 2Q23 10-Q contained substantively the same statements as referenced in ¶ 118, 124, 134, 138, and 144 which understated the safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls. Additionally, it overstated the Company's attempts at analyzing and identifying the defects within its vehicles' airbag inflators.

157.    Moreover, the 2Q23 10-Q included additional statements regarding the May 2023 recall of nearly 1 million vehicles, stating the following, in relevant part:

> In May 2023, we initiated a voluntary recall covering nearly one million 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia SUVs equipped with driver front airbag inflators manufactured by ARC Automotive, Inc. (ARC), and accrued an immaterial amount for the expected costs of the recall. As part of its ongoing investigation into ARC airbag inflators, NHTSA has issued a recall request letter to ARC, in which the agency (a) tentatively concluded that a defect related to motor vehicle safety exists in 67 million frontal driver and passenger air bag inflators manufactured by ARC and supplied to a number of automakers, including GM, and (b) demanded that ARC issue a recall notice for these inflators. ARC has disputed the recall request, asserting that no identified defect trend exists in the inflators and that any problems are related to isolated manufacturing issues. Depending on the outcome of the dispute between NHTSA and ARC, and the possibility of additional recalls, the cost of which may not be fully recoverable, it is reasonably possible that the costs associated with these matters in excess of amounts accrued could be material, but we are unable to provide an estimate of the amounts or range of reasonably possible material loss at this time.

> There are several putative class actions that have been filed against GM, including in the U.S., Canada, and Israel, arising out of allegations that airbag inflators manufactured by ARC are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of reasonably possible material loss.

158.    Additionally, the 2Q23 10-Q contained identical statements as referenced in ¶¶ 119, 125, 135, 139, and 145 regarding Cruise's AV technology's development and safety, in addition to its regulatory prospects and approvals.

159.     The statements referenced in ¶¶ 117 - 157 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

160.     On October 2, 2023, *NBC Bay Area* reported, in an article titled "Hit-and-run driver strikes pedestrian, tossing her into path of Cruise car in San Francisco," that a pedestrian had suffered significant injuries after she was run over by and pinned under one of GM's driverless Cruise AVs. The article stated, in relevant part:

> A woman crossing a normally busy stretch of downtown San Francisco suffered
> serious injuries Monday night after a hit-and-run driver struck her, throwing her
> into the path of an oncoming driverless Cruise car, which then ran her over,

according to video recorded by the [AV] that Cruise showed to the NBC Bay Area Investigative Unit.

The collision occurred around 9:30 p.m. near the corner of Fifth and Market streets. The driverless Cruise vehicle and the other sedan were traveling side-by-side, southbound on Fifth Street, according to video recorded by the driverless car. Cruise would not provide NBC Bay Area with a copy of the video but did show it to Senior Investigative Reporter Bigad Shaban.

161.    The *NBC* report also stated that Cruise cooperated with law enforcement in providing information for the accident and quoted a Cruise representative who stated, in relevant part:

"The [AV] then braked aggressively to minimize the impact," said Navideh Forghani, a Cruise spokesperson. "The driver of the other vehicle fled the scene, and at the request of the police the [AV] was kept in place. Our heartfelt concern and focus is the well-being of the person who was injured, and we are actively working with police to help identify the responsible driver."

Rescuers found the woman pinned beneath the left rear axel of the Cruise vehicle, according to San Francisco Fire Department Capt. Justin Schorr. After Cruise disabled the car remotely, rescuers were then "able to get the car up off her" and used the jaws of life to free her.

*** 

The woman suffered multiple traumatic injuries and was taken to San Francisco General Hospital, according to first responders. Her condition was still unknown as of late Tuesday.

Cruise tells the NBC Bay Area Investigative Unit it is turning over video of the accident to the San Francisco Police Department, which is now investigating the crash.

162.    The *NBC* report revealed that this was not the first safety incident with a Cruise autonomous vehicle. In fact, the California DMV launched a safety probe into Cruise's AVs in August 2023. On this, the *NBC* report stated:

The California DMV, which is responsible for regulating autonomous vehicles across the state, has already been in the midst of investigating Cruise's safety record after what the agency described as "recent concerning incidents."

The DMV launched its probe back in August, following a collision between a Cruise vehicle and a San Francisco fire truck.

In conjunction with its announcement, the DMV also noted that Cruise agreed to cut its San Francisco fleet of driverless cars in half, limiting the company to just 50 vehicles during the day and 150 vehicles during the evening hours while the DMV continues its investigation.

The DMV, which has the power to order driverless vehicles off the road by suspending or revoking their permits, has yet to issue any findings relating to its Cruise investigation or release a timeline of when it plans to do so.

163.    On this news, GM's stock price fell by $1.09 per share, or 3.36%, from closing at $32.47 per share on October 2, 2023 to close at $31.38 per share on October 3, 2023.

164.    Then, on October 5, 2023, the NHTSA held a public hearing to recommend a recall of more than 50 million airbag inflators that had been linked to potentially deadly explosions. The *Wall Street Journal* published an article the same day entitled "GM Has at Least 20 Million Vehicles With Potentially Dangerous Air-Bag Parts," citing people with intimate knowledge of GM's production and products. The article further revealed that at least 20 million of the Company's vehicles were built with the defective airbag inflators in question, at least one of which had led to a confirmed fatality. The article stated, in relevant part:

> [GM] has at least 20 million vehicles built with a potentially dangerous air-bag part that the government says should be recalled before more people are hurt or killed.
>
> The number of affected GM vehicles—a figure that hasn't been disclosed publicly—makes the Detroit-based automaker among the most exposed in a push by U.S. auto-safety regulators to recall 52 million air-bag inflators designed by Tennessee-based auto supplier ARC Automotive, according to people familiar with the matter.
>
> These inflators have been known to explode with too much force during a vehicle crash, sending metal shrapnel flying and hitting occupants in the face and neck with shards. At least two people have been killed, and several others injured in such incidents.
>
> The National Highway Traffic Safety Administration has yet to release how many vehicles overall would be covered by a recall, or which specific models would be affected. The number of GM cars and trucks with these inflators could be higher depending on how regulators proceed.

On Thursday, NHTSA held a public meeting on its determination that the air-bag parts are defective and should be recalled. In April, the regulatory agency sent a letter to ARC, demanding it recall the inflators, which are essentially mini-exploding devices designed to rapidly inflate the air-bag cushion in a collision.

A recall of this size would be among the U.S.'s largest in history.

\*\*\*

GM so far has done five recalls over a span of six years on vehicles that have the ARC-made air bags.

The latest one was earlier this year, when it recalled nearly one million Chevrolet and Buick SUVs, after a Michigan woman was injured in a crash in March.

GM, said in a statement, it believes the evidence and data presented by NHTSA at this time doesn't provide a basis for any further recalls, and the ones it has conducted already were done out of an abundance of caution.

165.    On this news, GM's stock price fell by $0.73 per share, or 2.35%, from closing at $31.04 per share on October 4, 2023, to close at $30.31 per share on October 5, 2023.

166.    On October 17, 2023, the NHTSA announced that it was opening a probe as to whether Cruise was taking sufficient precautions to protect pedestrians from Cruise's AVs. The NHTSA had reviewed approximately 594 Cruise vehicles and announced that the review suggests Cruise vehicles are "encroaching on pedestrians present in or entering roadways, including pedestrian crosswalks, in the proximity of the intended travel path of the vehicles" which "could increase the risk of collision with a pedestrian, which may result in severe injury or death."

167.    On this news, GM's stock price fell from $30.33 at the close of trading on October 17, 2023, by $0.85 per share, or 2.88%, to close at $29.48 on October 18, 2023.

168.    On October 24, 2023, the California DMV announced the immediate suspension of Cruise's driverless testing permits. The California DMV asserted that Cruise "ha[d] misrepresented … information related to [the] safety of the autonomous technology of its vehicles." In relevant part, the California DMV stated:

Public safety remains the California DMV's top priority, and the department's autonomous vehicle regulations provide a framework to facilitate the safe testing and deployment of this technology on California public roads. When there is an unreasonable risk to public safety, the DMV can immediately suspend or revoke permits. There is no set time for a suspension.

The California DMV today notified Cruise that the department is suspending Cruise's autonomous vehicle deployment and driverless testing permits, effective immediately. The DMV has provided Cruise with the steps needed to apply to reinstate its suspended permits, which the DMV will not approve until the company has fulfilled the requirements to the department's satisfaction. This decision does not impact the company's permit for testing with a safety driver.

Today's suspensions are based on the following:

- 13 CCR §228.20 (b) (6) – Based upon the performance of the vehicles, the Department determines the manufacturer's vehicles are not safe for the public's operation.
- 13 CCR §228.20 (b) (3) – The manufacturer has misrepresented any information related to safety of the autonomous technology of its vehicles.
- 13 CCR §227.42 (b) (5) – Any act or omission of the manufacturer or one of its agents, employees, contractors, or designees which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public.
- 13 CCR §227.42 (c) – The department shall immediately suspend or revoke the Manufacturer's Testing Permit or a Manufacturer's Testing Permit – Driverless Vehicles if a manufacturer is engaging in a practice in such a manner that immediate suspension is required for the safety of persons on a public road.

169.    On this news, GM's stock price fell by $0.66 per share, or 2.26%, from closing at

$29.22 per share on October 23, 2023, to close at $28.56 per share on October 24, 2023.

170.    Just two days later, on October 26, 2023, Cruise announced through a social post

on X (formerly known as Twitter) that it would pause all of its AV operations across the country

"to examine our processes, systems, and tools and reflect on how we can better operate in a way

that will earn public trust[.]" It further stated:

(1/3) The most important thing for us right now is to take steps to rebuild public trust. Part of this involves taking a hard look inwards and at how we do work at Cruise, even if it means doing things that are uncomfortable or difficult.

(2/3) In that spirit, we have decided to proactively pause driverless operations across all of our fleets while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust.

(3/3) This isn't related to any new on-road incidents, and supervised AV operations will continue. We think it's the right thing to do during a period when we need to be extra vigilant when it comes to risk, relentlessly focused on safety, & taking steps to rebuild public trust.

171.    On this news, GM's stock price fell by $1.33 per share, or 4.66%, from closing at $28.55 on October 26, 2023, to close at $27.22 per share on October 27, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

172.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.82 billion to repurchase approximately 72,812,191 shares of its own common stock.

173.    According to the 1Q22 10-Q, between February 2, 2022 and February 28, 2022, the Company repurchased approximately 3,331,523 shares of its own common stock at an average price per share of approximately $48.22, for a total cost to the Company of approximately $113.8 million.

174.    As the Company's stock price was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $50,384,212.03 for repurchases of its own stock between February 2, 2022 and February 28, 2022.

175.    According to the 2Q22 10-Q, between April 1, 2022 and April 30, 2022, the Company repurchased approximately 36,046 shares of its own common stock for an average price of $42.96 per share for a total cost to the Company of approximately $1,548,536.16.

176.    As the Company's stock was actually only worth $27.22, the price at closing on October 27, 2023, the Company overpaid by approximately $567,364.04 for repurchases of its own stock between April 1, 2022 and April 30, 2022.

177.    According to the 3Q22 10-Q, between July 1, 2022 and July 31, 2022, the Company repurchased approximately 5,813 shares of its own common stock for an average price of $31.19 per share for a total cost to the Company of approximately $181,307.47.

178.    As the Company's stock was actually worth only $27.22, the price at closing on October 27, 2023, the Company overpaid by approximately $23,077.61 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

179.    According to the 3Q22 10-Q, between August 1, 2022 and August 31, 2022, the Company repurchased approximately 15,499,447 shares of its own common stock for an average price of $39.32 per share for a total cost to the Company of approximately $ 609,438,256.04.

180.    As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $187,543,308.70 for repurchases of its own common stock between August 1, 2022 and August 31, 2022.

181.    According to the 3Q22 10-Q, between September 1, 2022 and September 30, 2022, the Company repurchased approximately 22,450,580 shares of its own common stock for an average price of $39.74 per share for a total cost to the Company of approximately $892,186,049.20.

182.    As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $281,081,262 for repurchases of its own common stock between September 1, 2022 and September 30, 2022.

183.    According to the 1Q23 10-Q, between January 1, 2023 and January 31, 2023, the Company repurchased 22,216 shares of its own common stock at an average price of $33.97 per share for a total cost to the Company of approximately $754,667.52.

184.    As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $149,958.00 for repurchases of its own shares between January 1, 2023 and January 31, 2023.

185.    According to the 1Q23 10-Q, between February 1, 2023 and February 28, 2023, the Company repurchased approximately 6,180,726 shares of its own common stock at an average price of $41.24 per share for a total cost to the Company of approximately $ 254,893,140.24.

186.    As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $86,653,778.52 for repurchases of its own common stock between February 1, 2023 and February 28, 2023.

187.    According to the 1Q23 10-Q, between March 1, 2023 and March 31, 2023, the Company repurchased approximately 5,276,241 shares of its own common stock at an average price of $38.06 per share for a total cost to the Company of approximately $200,813,732.46.

188.    As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $57,194,452.44 for repurchases of its own common stock between March 1, 2023 and March 31, 2023.

189.    According to the 2Q23 10-Q, between April 1, 2023 and April 30, 2023, the Company repurchased approximately 27,329 shares of its own common stock at an average price of $36.68 per share for a total cost to the Company of approximately 1,002,427.72.

190.     As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $258,532.34 for repurchases of its own common stock between April 1, 2023 and April 30, 2023.

191.     According to the 2Q23 10-Q, between May 1, 2023 and May 31, 2023, the Company repurchased approximately 5,276,241 shares of its own common stock at an average price of $33.32 per share at a total cost of $250,012,092.22.

192.     As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $45,155,706.00 for repurchases of its own shares between May 1, 2023 and May 31, 2023.

193.     According to the 2Q23 10-Q, between June 1, 2023 and June 30, 2023, the Company repurchased 6,881,651 shares of its own common stock at an average price of $36.33 per share at a total cost of $250,010,380.83.

194.     As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $62,691,840.61 for repurchases of its own shares between June 1, 2023 and June 30, 2023.

195.     According to the 3Q23 10-Q, between July 1, 2023 and July 31, 2023, the Company repurchased 4,248,465 shares of its own common stock at an average price of $38.45 per share for a total cost to the Company of $163,353,479.25.

196.     As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $47,710,261.95 for repurchases of its own stock between July 1, 2023 and July 31, 2023.

197.     According to the 3Q23 10-Q, between August 1, 2023 and August 31, 2023, the Company repurchased 2,326,203 shares of its own common stock at an average price of $37.83 per share at a total cost to the Company of $88,000,259.49.

198.     As the Company's stock was actually worth only $27.22 per share, the price at closing on October 27, 2023, the Company overpaid by approximately $24,681,013.83 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

199.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $844 million.

## DAMAGES TO GM

200.     As a direct and proximate result of the Individual Defendants' conduct, GM will lose and expend many millions of dollars.

201.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, Products Liability MDL, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

202.     Such losses include the Company's overpayment of over $844 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

203.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Airbag Safety Misconduct.

204.     Such expenditures also include, but are not limited to, fees, costs, and any payments associated with the NHTSA's investigations and/or civil inquiries into the Company arising from

the Airbag Safety Misconduct and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

205.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

206.    Such expenditures also include, but are not limited to, fees costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits or governmental investigations filed against the Company or the Individual Defendants based on safety concerns or pedestrian injuries as a result of Cruise AVs.

207.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the Airbag Safety Misconduct and any other misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

208.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

209.    As a direct and proximate result of the Individual Defendants' conduct, GM has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

210.    Plaintiff brings this action derivatively and for the benefit of GM to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of GM, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof, as well as for contributions under Sections 10(b) and 21D of the Exchange Act

211.    GM is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

212.    Plaintiff is, and has been at all relevant times, a shareholder of GM. Plaintiff will adequately and fairly represent the interests of GM in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

213.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

214.    A pre-suit demand on the Board of GM is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following thirteen individuals: Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig (the "Director Defendants"). Plaintiff needs only to allege demand futility as to seven of the thirteen Director Defendants that were on the Board at the time of the filing of this complaint.

215.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes

they engaged in knowingly or recklessly to cause the Company to engage in the Airbag Safety Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $844 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

216.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to engage in the Airbag Safety Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

217.   Additional reasons that demand on Defendant Barra is futile follow. Defendant Barra has served as the Company's CEO since January 15, 2014, and as Chair of the Board since January 4, 2016. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Barra with her principal occupation for which she receives handsome compensation. As CEO, Defendant Barra is ultimately responsible for the Company's engagement in the Airbag Safety Misconduct and all of the false and misleading statements and omissions that were made during the Relevant Period, including those which she signed in the 2021 and 2022 10-Ks, and the 1Q22, 2Q22, 3Q22, 1Q23, and 2Q23 10-Qs, for all of which she also signed SOX certifications. As the Company's highest officer, she conducted little, if any, oversight of the

schemes to cause the Company to engage in Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. All of this is even more concerning considering her extensive background in car engineering including high leadership roles at GM where she was "responsible for the design, engineering, and quality of GM vehicle launches worldwide."[3] In addition, her participation in or failure to oversee the Airbag Safety Misconduct conflicts with her staunch goal of creating "a world with zero crashes" and "to save lives."[4] Moreover, the 2022 and 2023 Proxy Statements were solicited on her behalf and contained false and misleading statements, which resulted in shareholders reelecting her to the Board and approving increased incentive compensation. Further, Defendant Barra is a defendant in the Securities Class Action. For these reasons, Defendant Barra breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Bhusri is futile follow. Defendant Bhusri has served as a Company director since 2021. As a member of the Board, he serves as a member of the Executive Compensation Committee and the Governance Committee. Defendant Bhusri has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets.

---

[3] *Mary T. Barra*, GENERAL MOTORS
https://www.gm.com/company/leadership.detail.html/Pages/bios/global/en/corporate-officers/Mary-Barra (last visited Jan. 22, 2024).
[4] *Id.*

Additionally, Defendant Bhusri signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Bhusri also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Bhusri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Bush is futile follow. Defendant Bush has served as a Company director since 2019. As a member of the Board, Defendant Bush serves as the Chair of the Executive Compensation Committee and as a member of the Audit Committee, Executive Committee, and Finance Committee. Defendant Bush has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Bush signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Bush also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Bush breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Crevoiserat is futile follow. Defendant Crevoiserat has served as a Company director since August 2022. As a member of the Board, Defendant Crevoiserat serves as a member of the Audit Committee, Finance Committee, and Governance Committee. Defendant Crevoiserat has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. Additionally, Defendant Crevoiserat signed, and therefore personally made, the false and misleading statements contained in the 2022 10-K. Defendant Bush also solicited the false and misleading 2023 Proxy Statement, which resulted in, *inter alia*, her election to the Board and amendments to the 2020 Long-Term Incentive Plan for which she may personally benefit. For these reasons, Defendant Crevoiserat breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

221.    Additional reasons that demand on Defendant Gooden is futile follow. Defendant Gooden has served as a Company director since 2015. As a member of the Board, Defendant Gooden serves as Chair of the Risk and Cybersecurity Committee and as a member of the Audit Committee and Executive Committee. Defendant Gooden has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously

70

disregarded her duty to protect corporate assets. Additionally, Defendant Gooden signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Gooden also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, her election to the Board and amendments to the 2020 Long-Term Incentive Plan for which she may personally benefit. For these reasons, Defendant Gooden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

222.    Additional reasons that demand on Defendant Jimenez is futile follow. Defendant Jimenez has served on the Board since 2015. As a member of the Board, Defendant Jimenez serves as Chair of the Finance Committee and as a member on the Executive Committee, Executive Compensation Committee, and Risk & Cybersecurity Committee.  Defendant Jimenez has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Jimenez signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Jimenez also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Jimenez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant McNeill is futile follow. Defendant McNeill has served on the Board since September 2022. As a member of the Board, he serves on the Governance Committee. Defendant McNeill has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant McNeill signed, and therefore personally made, the false and misleading statements contained in the 2022 10-K. Defendant McNeill also solicited the false and misleading 2023 Proxy Statement, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant McNeill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224.    Additional reasons that demand on Defendant Miscik is futile follow. Defendant Miscik has served on the Board since 2018. As a member of the Board, she serves on the Finance Committee and the Risk and Cybersecurity Committee. Defendant Miscik has received and continues to receive compensation for her role on the Board as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. Additionally, Defendant Miscik signed, and therefore personally made, the false and misleading statements contained in the 2021

10-K and the 2022 10-K. Defendant Miscik also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, her election to the Board and amendments to the 2020 Long-Term Incentive Plan for which she may personally benefit. For these reasons, Defendant Miscik breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

225.   Additional reasons that demand on Defendant Russo is futile follow. Defendant Russo has served as a member of the Board since 2009 and as Independent Lead Director since March 2010. As a member of the Board, Defendant Russo serves as the Chair of the Governance Committee and as a member of the Executive, Executive Compensation, and Finance Committees. Defendant Russo has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. Additionally, Defendant Russo signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Russo also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, her election to the Board and amendments to the 2020 Long-Term Incentive Plan for which she may personally benefit. For these reasons, Defendant Russo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

226.   Additional reasons that demand on Defendant Schoewe is futile follow. Defendant Schoewe has served as a member of the Board since 2011. As a member of the Board, Defendant

Schoewe serves as the Chair of the Audit Committee and as a member of the Executive, Finance, and Risk and Cybersecurity Committees. Defendant Schoewe has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Schoewe signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Schoewe also solicited the false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Schoewe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Tatum is futile follow. Defendant Tatum has served as a member of the Board since 2021. As a member of the Board, Defendant Tatum serves as a member of the Audit Committee and the Governance Committee. Defendant Tatum has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Tatum signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Tatum also solicited the

false and misleading 2022 and 2023 Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Tatum breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.    Additional reasons that demand on Defendant Tighe is futile follows. Defendant Tighe has served as a member of the Board since April 2023. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Tighe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

229.    Additional reasons that demand on Defendant Wenig is futile follow. Defendant Wenig has served as a member of the Board since 2018. As a member of the Board, Defendant Wenig serves on the Risk and Cybersecurity Committee. Defendant Wenig has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Airbag Safety Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Wenig signed, and therefore personally made, the false and misleading statements contained in the 2021 10-K and the 2022 10-K. Defendant Wenig also solicited the false and misleading 2022 and 2023

Proxy Statements, which resulted in, *inter alia*, his election to the Board and amendments to the 2020 Long-Term Incentive Plan for which he may personally benefit. For these reasons, Defendant Wenig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on the Board is futile follow.

231.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $840 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

232.    Defendants Schoewe, Bush, Crevoiserat, Gooden, and Tatum served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Schoewe, Bush, Crevoiserat, Gooden, and Tatum failed to adequately review and discuss the Company's Forms 10-K and 10-Qs; failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the Airbag Safety Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Schoewe, Bush, Crevoiserat, Gooden, and Tatum further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

233.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the schemes to cause the Company to engage in the Airbag Safety Misconduct, to issue

materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a),10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; prevent the Company from participating in the Airbag Safety Misconduct; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

234.    GM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for GM any part of the damages GM suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

235.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

236. The acts complained of herein constitute violations of fiduciary duties owed by GM's officers and directors, and these acts are incapable of ratification.

237. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GM. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of GM, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

238. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause GM to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

239. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

240.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

241.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

242.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

243.    Under the direction and watch of Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig, the 2022 Proxy Statement failed to disclose: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or

AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

244.    Under the direction and watch of Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig, the 2023 Proxy Statement failed to disclose(1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

245.    Moreover, the 2022 and 2023 Proxy Statements failed to disclose that the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1)

participating in and/or facilitating the Company's participation in the Airbag Safety Misconduct; (2) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Conduct. Further, the 2022 and 2023 Proxy Statements were materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

246.   Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

247.   Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors and increases to the 2020 Long-Term Incentive Plan.

248.   As a result of Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

249.     As a result of Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company and increase incentives under the 2020 Long-Term Incentive Plan thereby potentially rewarding them for their misconduct.

250.     The Company was damaged as a result of Defendants Barra, Bhusri, Bush, Gooden, Jimenez, Miscik, Russo, Schoewe, Stephenson, Tatum, and Wenig's material misrepresentations and omissions in the 2022 Proxy Statement.

251.     The Company was damaged as a result of Defendants Barra, Bhusri, Bush, Crevoiserat, Gooden, Jimenez, McNeill, Miscik, Russo, Schoewe, Tatum, Tighe, and Wenig's material misrepresentations and omissions in the 2023 Proxy Statement.

252.     Plaintiff, on behalf of GM, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

253.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.     The Individual Defendants, by virtue of their positions with GM and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of GM and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause GM to engage in the illegal conduct and practices complained of herein.

255.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding GM. Not only is GM now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon GM by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 72.8 million of its own shares at artificially-inflated prices, damaging GM.

258.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

259.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about GM not misleading.

260.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by GM.

261.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

262.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GM's business and affairs.

266.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

267.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GM.

268.     In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Airbag Safety Misconduct.

269.     In breach of their fiduciary duties owed to GM, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) GM engaged in the Airbag Safety Misconduct which understated the safety concerns plaguing the airbags in its vehicles and the need to record additional warranty accruals for product recalls; (2) GM had overstated the effectiveness of its efforts to mitigate its Airbag Safety Misconduct and identify defects in its vehicles' airbag inflators; (3) GM had misled investors, regulators, and the general public on the safety and development of Cruise's AVs and/or AV technology; (4) the regulatory approval of Cruise's AV and associated driverless testing permits were premised on GM overstating the safety of Cruise AV technology; (5) all the foregoing subjected GM to increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

270.     The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

271.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

272.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

273.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Airbag Safety Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Airbag Safety Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Airbag Safety Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GM's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

274.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

275.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GM has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

276.    Plaintiff, on behalf of GM, has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

277.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

278.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GM.

279.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GM that was tied to the performance or artificially inflated valuation of GM or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

280.    Plaintiff, as a shareholder and a representative of GM, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

281.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

282.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GM, for which they are legally responsible.

284.    As a direct and proximate result of the Individual Defendants' abuse of control, GM has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, GM has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

285.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

286.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

287.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GM in a manner consistent with the operations of a publicly held corporation.

288.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GM has sustained and will continue to sustain significant damages.

289.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

290.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

291.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

292.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

293.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GM to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries by the NHTSA, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

294.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

295.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

296.    Plaintiff, on behalf of GM, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Barra and Jacobson for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

297.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

298.    GM and Defendants Barra and Jacobson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Barra's and Jacobson's willful and/or reckless violations of their obligations as officers and/or directors of GM.

299.    Defendants Barra and Jacobson, because of their positions of control and authority as officers and/or directors of GM, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of GM, including the wrongful acts complained of herein and in the Securities Class Action.

300.    Accordingly, Defendants Barra and Jacobson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

301.    As such, GM is entitled to receive all appropriate contribution or indemnification from Defendants Barra and Jacobson.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of GM, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GM;

(c)    Determining and awarding to GM the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing GM and the Individual Defendants to take all necessary actions to reform and improve GM's corporate governance and internal procedures to comply with applicable laws and to protect GM and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of GM to nominate at least seven candidates for election to the board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding GM restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

**[THIS SPACE WAS INTENTIONALLY LEFT BLANK]**

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

January 30, 2024

Respectfully Submitted,

*/s/ Jeffrey Lance Abood*

**Andrew P. Abood (P43366)**
**Jeffrey Lance Abood (P72607)**
**ABOOD LAW FIRM**
*Local Counsel*
855 Forest Avenue
Birmingham, Michigan 48009
Telephone: (248) 549-0000
Facsimile: (248) 549-2222
Email: andrew@aboodlaw.com
        jeff@aboodlaw.com


**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &**
**GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com